IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2015 MAY 20  PM 2: 56

CLERK C Adams
SO. DIST. OF GA.

MORNING STAR ASSOCIATES, INC.;      *
MARGARET HERRMANN; ROBERT           *
MCMAHON; and CHRISTOPHER            *
HERRMANN,                           *
                                    *
        Plaintiffs,                 *
                                    *
    v.                              *                CV 115-033
                                    *
UNISHIPPERS GLOBAL LOGISTICS,       *
LLC,                                *
                                    *
        Defendant.                  *

---

## O R D E R

Presently before the Court is Defendant Unishippers Global
Logistics, LLC's ("Unishippers") Motion to Dismiss and to Compel
Arbitration (Doc. no. 11) and Plaintiff Chris Herrmann's ("Mr.
Herrmann") Motion for Preliminary and Permanent Injunction (Doc.
no. 20).  For the reasons set forth herein, Unishippers' Motion
is **GRANTED IN PART**.  The parties are to submit to arbitration,
and this matter shall be stayed until arbitration is completed.
Because the Court finds that the parties must proceed to
arbitration, Mr. Herrmann's Motion for Preliminary and Permanent
Injunction is **DENIED**.

# I. **Factual Background**[1]

The present dispute arises out of the termination of three franchise agreements between Defendant-Franchisor Unishippers and Plaintiffs-Franchisees Morning Star Associates, Inc. ("MSA"), Margaret Herrmann ("Ms. Herrmann"), Robert McMahon ("Mr. McMahon"), and Mr. Herrmann. Ms. Herrmann and Mr. McMahon are owners and officers of MSA. (Doc. no. 18, Exs. 5 & 10.) Mr. Herrmann worked as an administrator, sales agent, and manager of MSA. (Doc. no. 18, Ex. 1 ¶ 4.) All three individuals aver that their duties involved "handling and overseeing the administrative paperwork associated with shipping and freight, working with customers on bills of lading, and processing customers' shipments via common carriers, rail, and other means," as well as assisting "with the pricing and most aspects of the shipping transaction." (Doc. no. 18, Ex. 1 ¶ 5; Id., Ex. 5 ¶ 5; Id., Ex. 10 ¶ 3.) At some undisclosed time in the past, MSA entered into three separate franchise agreements (collectively referred to as "the Franchise Agreement") with Unishippers for franchises located in Georgia,[2] North Carolina, and South Carolina. (Lathrop Decl., Doc. no. 12, Ex. 1, ¶ 4.)

---

[1] Motions to compel arbitration are reviewed under the same standard as motions for summary judgment. The Variable Annuity Life Ins. Co. v. Joinder, No. CV206-110, 2006 WL 1737443, at *2 (S.D. Ga. June 23, 2006). "In doing so, the court must consider all evidence presented by the party opposing arbitration and construe all reasonable inferences in that party's favor." Id.

[2] MSA is incorporated in Georgia and its principal place of business is in Martinez, Georgia. (Compl., Doc. no. 1, ¶ 1.)

## A. The Franchise Agreement[3]

On September 29, 2014, the President of Unishippers sent MSA a Notice of Breach of the Franchise Agreement, alleging that MSA was in breach of certain revenue requirements, and provided MSA with approximately two months to cure the breach.[4] (Doc. no. 18-5, Ex. A.) On December 5, 2014, MSA received a Notice of Termination of its three franchises, informing MSA that the Franchise Agreement would be terminated pursuant to Section 6.04(b)(xiii).[5] (Id., Ex. B.) In the Notice of Termination, Unishippers presented MSA with two options: (1) MSA could submit a Letter of Intent to sell the rights to the franchises by February 6, 2015, or (2) if MSA did not wish to sign a Letter of

---

[3] Unishippers represents that all three franchise agreements have identical language, aside from their geographic location information, a fact which Plaintiffs dispute. (Lathrop Decl. ¶ 7; Doc. no. 18-5 ¶ 3.) Even so, at no point in Plaintiffs' briefs do they dispute the particular sections relied upon by Unishippers, and Plaintiffs cite various provisions of the Franchise Agreement to support their arguments. In the absence of any particular objection, the Court proceeds under Unishippers' representation.

[4] According to MSA, it received information in November 2014 that two of its franchises had attained the necessary revenue goals, but after receiving such notice, Unishippers changed the revenue rules and disallowed certain revenues to count toward the goals. (Compl. ¶¶ 14-15.) MSA alleges that Unishippers "effectively made up the revenue rules to ensure Morning Star would fail the revenue test so that it could declare breach and ultimately termination." (Id. ¶ 17.)

[5] Section 6.04(b)(xiii) of the Franchise Agreement provides:

> [Unishippers] may terminate this Agreement thirty (30) days after giving [MSA] written notice specifying any of the following breaches or defaults by [MSA] if it remains uncured at the end of the 30-day period: . . . (xiii) Others. Default, breach or failure to comply with or perform any of [MSA's] obligations, agreements, covenants, promises, representations, warranties or requirements under this Agreement or any other agreement between [Unishippers] and [MSA].

(Franchise Agreement, Doc. no. 12-2, § 6.04(b)(xiii).)

Intent, Unishippers would terminate the Franchise Agreement on February 6, 2015. (Id.) If MSA chose the latter option, pursuant to Section 7.02(b)[6] of the Franchise Agreement, Unishippers would "authorize [MSA] to retain all customer lists for the Franchise; however, [MSA] [would] not be able to use any of the carrier companies that provide shipping services to Unishippers and its customers." (Id.)

MSA did not sign the Letter of Intent by February 6, 2015, but received an e-mail that day from Unishippers giving MSA additional time to sign a Letter of Intent. (Id., Ex. C.) However, MSA "had already shut down the franchise by that time and let employees go in reliance on [Unishippers'] Notice of Termination." (Pl. Resp., Doc. no. 17, at 4.) On February 20, 2015, Unishippers sent MSA a Termination Notice and Legal Demand, which terminated the three franchises pursuant to Section 6.04(a)[7] of the Franchise Agreement. (Id., Ex. D.)

---

[6]     Section 7.02(b) of the Franchise Agreement provides:

> Only with respect to termination of this Agreement pursuant to Section 6.04(b) . . . [Unishippers] shall elect to do one of the following:   . . . (b) authorize [MSA] in writing to retain all Customer lists for the Marketing Area pertaining to or arising from the operation of the Franchise, authorize [MSA] in writing to negotiate and enter into a contract with one or more carrier companies (other than those Carriers with which [Unishippers] has a contract at that time) for the provision of transportation services similar to those provided under the Carrier Contracts then in effect, and provide [MSA] with a written waiver of those provisions of Sections 4.05, 4.06, 7.01(n), and 8.02 in conflict with the above two written authorizations.

(Id. § 7.02(b).)

[7]     Section 6.04(a) of the Franchise Agreement provides that "[Unishippers] may terminate this Agreement without giving advance notice and without giving an opportunity to cure or paying a termination payment" if any one of a long

4

Unishippers demanded, *inter alia*, that MSA immediately cease all use of Unishippers' customer information; return all of Unishippers' customer information; cease servicing Unishippers' customers; pay all carrier obligations and franchise fees due to Unishippers; forward all accounts receivable to Unishippers; produce copies of the non-competition agreements signed by MSA employees; and otherwise comply with the post-termination provisions of the Franchise Agreement. (Id.) If MSA failed to comply, Unishippers stated that it "will have no choice but to bring legal action . . . for injunctive relief, damages and attorney's fees." (Id.) According to MSA, the February 20, 2015 letter "attempted to undo and rewrite its earlier termination on which [MSA] had already justifiably relied" by terminating the franchise under Section 6.04(a), a more onerous provision than Section 7.02(b). (Pl. Resp. at 4-5.)

Moreover, MSA contends that Unishippers never followed the three-step dispute resolution process outlined in the Franchise Agreement. (Id. at 5.) Pursuant to the Franchise Agreement, the parties must first meet face-to-face to try and resolve any dispute amicably. (Franchise Agreement, Doc. no. 12-2, § 9.01(a)(1).) If unsuccessful, the parties are to submit to non-binding mediation. (Id. § 9.01(a)(2).) As a final step,

list of breaches occur. (Id. § 6.04(a).) In the Termination Notice and Legal Demand, Unishippers stated that MSA "violated at least one, if not all, of the following subsections: (ii) unauthorized transfer; (iv) misrepresentation; (vii) improper use and disclosure of Unishippers' confidential information; (xi) abandonment of the franchise business; and/or (xi) breach of [] non-compete/non-disclosure obligations." (Doc. no. 18-9.)

the parties are to submit to binding arbitration. (Id. § 9.01(a)(3).) The Franchise Agreement additionally contains a delegation provision, requiring all issues relating to arbitration and enforcement of the agreement to be decided by an arbitrator. (Id. § 9.01(f).) However, the Franchise Agreement provides certain exceptions to the arbitration requirement, expressly excluding from arbitration issues relating to: (1) the validity of trademarks or other intellectual property licensed to MSA; (2) Unishippers' rights to possession of real or personal property; (3) the parties' rights to obtain pre-judgment remedies such as a writ of attachment; (4) Unishippers' right to receive and enforce equitable relief; and (5) Unishippers' or MSA's *intentional interruption of business operations* "with the exception of the provisions of Section 6 relating to Breaches, Defaults or Termination[.]" (Id. § 9.01(e).)

The Franchise Agreement forms the basis for many of Plaintiffs' claims. Plaintiffs assert that (1) Unishippers breached the Franchise Agreement and its duty of good faith and fair dealing (Compl. ¶¶ 24-28); (2) Unishippers was unjustly enriched (Id. ¶¶ 29-33); (3) Unishippers improperly converted and exercised ownership over Plaintiffs' property (Id. ¶¶ 37-39); (4) Unishippers falsely represented to Plaintiffs that it would perform under the Franchise Agreement, intentionally made these false representations, and intentionally concealed

6

information from Plaintiffs (Id. ¶¶ 40-49); (5) Unishippers breached its duty to insure it performed its obligations under the Franchise Agreement (Id. ¶¶ 50-56); (6) Unishippers "induced a breach of contractual obligations and attempted to cause third parties to discontinue or fail to enter into an anticipated business relationship with Plaintiffs" (Id. ¶ 58); (7) Unishippers misappropriated Plaintiffs' trade secrets by using and disclosing them (Id. ¶¶ 63-72); (8) Unishippers engaged in unfair competition by using and obtaining confidential information, including customer lists and business opportunities (Id. ¶¶ 73-75); and (9) Unishippers conspired to push MSA, Ms. Herrmann, and Mr. McMahon out of the franchise and obtain MSA's client lists (Id. ¶¶ 76-79). Plaintiffs additionally seek a declaration that the Franchise Agreement was terminated in accordance with Section 7.02(b) (Id. ¶¶ 34-36), and request an interlocutory and permanent injunction to enjoin Unishippers from enforcing portions of the Franchise Agreement that were waived under Section 7.02(b) (Id. ¶¶ 80-82). Unishippers contends that these disputes must be submitted to binding arbitration pursuant to the Franchise Agreement.

**B.      Mr. Herrmann's Non-Competition/Non-Disclosure Agreement**

Underlying this larger dispute is another between Unishippers and Mr. Herrmann only. Mr. Herrmann began his employment with MSA in 2005. (Chris Herrmann Decl., Doc. no.

18-1, ¶ 1.)   As required by Section 3.09(a) of the Franchise Agreement, Mr. Herrmann signed a Non-Competition/Non-Disclosure Agreement (the "Non-Competition Agreement") with MSA.   (Non-Competition Agreement, Doc. no. 18-1, Ex. A.)   That agreement was drafted by Unishippers.[8]   As its name suggests, the Non-Competition Agreement prohibits Mr. Herrmann from competing with MSA or Unishippers.   (Non-Competition Agreement § 4.)   It additionally prohibits Mr. Herrmann from using or disclosing confidential information after his termination date.   (Id. §§ 2-3.)   Although the agreement only specifically pertains to MSA and Mr. Herrmann, Unishippers is expressly contemplated as a third party beneficiary.[9]   (Id. § 15.)

Pursuant to the Non-Competition Agreement, certain provisions may be mutually waived by Mr. Herrmann and MSA if signed and in writing.   (Id. § 9.D.)   The waiver of one provision in the agreement, however, would not constitute waiver of any other provision.   (Id. § 14.)   Purportedly out of a concern over the status of the franchises and his ability to secure future employment, Mr. Herrmann and MSA exercised this

[8]   Although Unishippers' counsel could not say definitively whether its client drafted the Non-Competition Agreement, a review of the Franchise Agreement addenda reveals that Unishippers provided its franchisees with a copy of the agreement.   (Franchise Agreement, Ex. G.)

[9]   At the hearing on Mr. Herrmann's Motion for Preliminary Injunction, Plaintiffs' counsel raised the issue of Unishippers' standing to enforce the Non-Competition Agreement.   Specifically, they argued that "Unishippers Association, Inc." is the denoted third party beneficiary, not Defendant Unishippers Global Logistics, LLC.   As explained by defense counsel at the hearing, Unishippers Global Logistics, LLC is Unishippers Association, Inc.'s successor and assign and therefore has standing to enforce the Non-Competition Agreement.

option on December 1, 2015. (Chris Herrmann Decl. ¶ 19 & Ex. B.) Mr. Herrmann and MSA specifically waived Sections 2 through 4 (the non-disclosure and non-competition provisions), as well as Section 15, which named Unishippers as a third party beneficiary. (Chris Herrmann Decl., Ex. B.) Nowhere in the waiver is there any mention of arbitration, aside from executing the waiver pursuant to Section 9, Paragraph D, which is the dispute resolution section of the Non-Competition Agreement. (See id.)

On February 17, 2015, Unishippers' counsel sent Mr. Herrmann a cease and desist letter, claiming that Mr. Herrmann was in breach of the Non-Competition Agreement. (Id., Ex. C.) In the letter, Unishippers demanded that Mr. Herrmann cease all competitive conduct and return all customer lists and other confidential information to Unishippers. (Id.) If Mr. Herrmann failed to comply with the letter, Unishippers informed him that it "will have no choice but to bring legal action against [him, his] company and associates for injunctive relief and monetary damages." (Id.) In Plaintiffs' complaint, Mr. Herrmann seeks a declaration that the Non-Competition Agreement is invalid and unenforceable, and also requests an interlocutory and permanent injunction to enjoin Unishippers from enforcing the Non-Competition Agreement.

C.        **Procedural History**

Plaintiffs filed the instant complaint on February 27, 2015. In lieu of an answer, Unishippers filed a Motion to Dismiss and to Compel Arbitration. Plaintiffs responded and requested oral argument. Before Unishippers' motion was ripe for review, Mr. Herrmann filed a Motion for Preliminary Injunction on April 24, 2015. In that motion and at oral argument, Mr. Herrmann alleged that Unishippers continued to contact his customers and GlobalTranz Enterprises, Inc., a competitor of Unishippers with which Mr. Herrmann does business, specifically referencing that Mr. Herrmann was in violation of the Non-Competition Agreement. Unishippers maintained that an injunction is improper because the Non-Competition Agreement contained an arbitration provision. With the Motion to Dismiss and Compel Arbitration now ripe, the Court considers the two motions concurrently.

## II.  **Motion to Dismiss and Compel Arbitration**

The Federal Arbitration Act ("FAA") provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. To enforce this provision, the FAA imposes an obligation on courts, "upon being satisfied that the issue

involved in such suit or proceeding is referable to arbitration under such an agreement," to stay the action until arbitration has been completed in accordance with the terms of the agreement. Id. § 3. "The FAA creates a strong federal policy in favor of arbitration." Picard v. Credit Solutions, Inc., 564 F.3d 1249, 1252 (11th Cir. 2009). Indeed, this Court must "construe arbitration clauses generously, resolving all doubts in favor of arbitration." Becker v. Davis, 491 F.3d 1292, 1305 (11th Cir. 2007), *abrogated on other grounds by* Arthur Anderson LLP v. Carlisle, 556 U.S. 624 (2009). "In the face of an agreement to arbitrate, the party resisting arbitration must identify enough evidence in the record to make its denial of a valid agreement colorable." Thi of Ga. at Shamrock, LLC v. Fields, No. CV 313-032, 2013 WL 6097569, at *3 (S.D. Ga. Nov. 18, 2013). "The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).

Plaintiffs make four challenges to the arbitration provisions. First, they contend that they are exempt from the FAA as transportation workers. Next, they argue that the Non-Competition Agreement was either waived or is invalid under

Georgia law.  Third, Plaintiffs contend that Unishippers does not have a valid agreement to arbitrate.  Finally, they argue that their claims fall outside the scope of the Franchise Agreement's arbitration provision.  The final three of Plaintiffs' arguments, however, can be addressed with reference to the delegation provision contained in both contracts.  Accordingly, the Court addresses them jointly.

## A.    Exemption Under the FAA

"[A] district court has no authority to compel arbitration . . . where Section 1 exempts the underlying contract from the FAA's provisions."  Van Dusen v. Swift Transp. Co., 654 F.3d 838, 843 (9th Cir. 2011).  The FAA expressly exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  In interpreting the meaning of "workers engaged in foreign or interstate commerce," the Supreme Court has concluded that the "exception should be narrowly construed to apply only to 'transportation workers' and not to employment contracts in general."  Hill v. Rent-A-Center, Inc., 398 F.3d 1286, 1289 (11th Cir. 2005) (citing Circuit City v. Adams, 532 U.S. 105, 115 (2001)).  Plaintiffs argue that the Non-Competition and Franchise Agreements fall under this exception as employment contracts for transportation workers.  Unishippers counters that (1) MSA, Mr. McMahon, and Ms. Herrmann

are not Unishippers' employees and, implicitly, the Franchise Agreement is not a contract of employment and (2) even if Mr. Herrmann's Non-Competition Agreement is an employment agreement, he is not a transportation worker.

"The FAA affords scant guidance on defining an exempted employment relationship." Bell v. Atl. Trucking Co., No: 3:09-cv-406, 2009 WL 4730564, at *4 (M.D. Fla. Dec. 7, 2009); see also Carney v. JNJ Express, Inc., 10 F. Supp. 3d 848, 852-54 (W.D. Tenn. 2014) (discussing a split in authority on the scope of employment relationships); Owner-Operator Indep. Drivers Ass'n v. C.R. England, Inc., 325 F. Supp. 2d 1252, 1257 (D. Utah 2004) (recognizing "a split of authority on the scope of this section's exemption"); Gagnon v. Serv. Trucking, Inc., 266 F. Supp. 2d 1361, 1364 (M.D. Fla. 2003) ("The text of the FAA is not particularly helpful in defining the term 'contract of employment' nor is there any case law that expressly deals with the issue of whether a Lease Agreement, like the one in the instant case, constitutes an employment contract for the purposes of the FAA."), vacated pursuant to settlement by No. 5:02-cv-342, 2004 WL 290743 (M.D. Fla. Feb. 3, 2004). This uncertainty notwithstanding, the Eleventh Circuit has been exceptionally clear about one thing: "[A]ll doubts are to be resolved in favor of arbitration." Ruby-Collins, Inc. v. City of Huntsville, Ala., 748 F.2d 573, 576 (11th Cir. 1984); see also Gregory v. Electro-Mech. Corp., 83 F.3d 382, 385-86 (11th

13

Cir. 1996) (same); Seaboard Coast Line R.R. Co. v. Trailer Train Co., 690 F.2d 1343, 1348 (11th Cir. 1982).

To fit within the FAA's narrow exception and circumvent the clear Congressional intent that arbitration provisions be enforced, Plaintiffs have the burden to show that the Franchise Agreement is an employment contract and that they are transportation workers. Owner-Operator Independent Drivers Ass'n, Inc. v. Swift Transp. Co., 288 F. Supp. 2d 1033, 1035 (D. Ariz. 2003) (citing Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991)). First, the Court finds that MSA, Mr. McMahon, and Ms. Herrmann are not Unishippers' employees. Plaintiffs "have neither cited the Court to any controlling case law establishing that the § 1 exemption is applicable under the circumstances of this action, and the Court is aware of none[.]" See id. at 1035. In recognition of the lack of authority supporting their position with regard to the FAA, Plaintiffs rely almost exclusively on case law from Fair Labor Standards Act and Title VII cases addressing joint employment relationships. Based on these cases, Plaintiffs argue that Unishippers exercised sufficient control over MSA and its employees to transform an otherwise franchisor-franchisee/independent contractor relationship into that of employer-employee. Without guidance from any controlling precedent, the Court is hesitant to apply principles from

entirely different areas of the law to expand the § 1 exemption that Congress intended to be narrowly applied.

Even so, a review of the Franchise Agreement does not support the position that Unishippers exercised sufficient control to become Plaintiffs' employer. Plaintiffs point to a number of provisions within the Franchise Agreement that indicate Unishippers exercised sufficient control to be considered an employer. For example, Section 2.09 requires MSA to maintain liability insurance and name Unishippers as an additional insured; Section 2.10 requires MSA to indemnify Unishippers; Section 3.01 requires MSA to comply with certain standards, ranging from performance guidelines to qualifications and dress of franchise personnel; Section 3.09 requires all sales personnel to attend training sessions provided by Unishippers; and Section 3.09 also requires MSA to employ at least one sales person. Franchisees, under the agreement, are additionally required to pay an initial Franchise Fee of $5,000 and monthly royalty payments. (Franchise Agreement §§ 2.01 & 2.02.)

However, "[s]uch independent contractor or franchise agreements are common in the American commercial world[,]" Howell v. Chick-Fil-A, Inc., No. 92-30188-RV, 1993 WL 603296, at *2 (N.D. Fla. Nov. 1, 1993), and courts have held that agreements which allow the franchisor to retain control over certain standards do not transform the relationship of an

independent contractor to that of employee.   See id. ("Such control is essential and does not make the restaurant operator or manager an employee."); Evans v. McDonald's Corp., 936 F.2d 1087, 1090 (10th Cir. 1991) ("Outside of the necessary control over conformity to standard operational details inherent in many franchise settings, McDonald's only real control over Everett Allen was its power to terminate his franchises.   Thus, on the record before us, we hold, as a matter of law, that McDonald's did not have the control over Everett Allen's franchises necessary to make it liable as an employer of Everett Allen's employees under Title VII.").

Plaintiffs do not dispute that the Franchise Agreement contemplates the relationship to be that of an independent contractor.   (Franchise Agreement § 8.01.)   See also Swift, 288 F. Supp. 2d at 1035 (recognizing that the plaintiffs did not dispute that, under the terms of the pertinent agreement, they were independent contractors).   Aside from requiring at least one sales representative and mandating certain standards (including dress and training), Unishippers does not appear to have any authority to control labor relations within the franchise.   There is no indication that Unishippers oversees recruitment, hiring, interviewing, wage rates, or benefits.   Cf. Howell, 1993 WL 603296, at *3 (finding that although Chick-Fil-A "rigidly controlled the type and quality of the food sold in the Cordova Mall restaurant, it had almost no control over labor

16

practices" because the franchisee retained "complete discretion in deciding how many people the restaurant should employ. He was completely responsible for recruiting, interviewing, hiring, training, and terminating employees. [He] had unfettered discretion over wage rates, work schedules, employees (sic) duties, benefits, vacations, and work place policies and procedures."). Indeed, this case presents a strikingly similar factual scenario to Evans, where the franchisor "stringently controlled the manner of its franchisee's operations, conducted frequent inspections, and provided training for franchise employees." 936 F.2d at 1090. What was lacking in Evans, and the instant case, however, is any control over the franchisee's labor relations. See id. As in both of these cases, Unishippers merely reserved the right to control certain quality standards in order to maintain its brand, a practice common among franchises. Accordingly, the Court finds that the Franchise Agreement is not a contract of employment, and instead only creates an independent contractor/franchise relationship.

Turning to Mr. Herrmann and his Non-Competition Agreement specifically, Unishippers appears to assume for the sake of argument that his Non-Competition Agreement is an employment contract. In the absence of any specific instruction from the Eleventh Circuit regarding the scope of the § 1 exemption, the Court is again hesitant to extend it to Mr. Herrmann's Non-Competition Agreement. The Court has already found that MSA and

Unishippers were not engaged in an employer-employee relationship. Therefore, and for the same reasons, the Court finds that Mr. Herrmann was not an employee of Unishippers. See Howell, 1993 WL 603296, at *4 (holding that because the franchise owner was an independent contractor and not an employee, the court need not address the second tier issue of whether the franchisee's employee was an employee of Chick-Fil-A). Plaintiffs repeatedly reminded the Court at the hearing on Mr. Herrmann's Motion for a Preliminary Injunction that the Non-Competition Agreement is between MSA and Mr. Herrmann — not Unishippers. And while Unishippers is listed as a third-party beneficiary in that agreement, it is only a "terminable third-party beneficiary." (Doc. no. 20 at 2.) In light of these statements, Plaintiffs have presented no authority to suggest that a non-compete between a named party and a "terminable third-party beneficiary" with whom no employment relationship exists is a "contract of employment," as contemplated by the FAA.

Moreover, Plaintiffs' assertion of the FAA exemption as applied to Mr. Herrmann's Non-Competition Agreement fails for two additional reasons. First, as emphasized above, Plaintiffs cite no controlling or persuasive precedent which warrants extending the "transportation worker" exemption to those working as freight brokers in the logistics field. Indeed, the Court's independent review reveals the only court to be presented with

this particular issue declined to rule that a logistics worker is a "transportation worker" under § 1, finding that whether the contract was covered by the FAA was of no import because the contract was covered under Texas General Arbitration Act.  Long v. BDP Int'l, Inc., 919 F. Supp. 2d 832, 850 (S.D. Tex. 2013).

Second, even applying an eight-factor test utilized by the Eighth Circuit to determine "whether an employee is so closely related to interstate commerce that he or she fits within the § 1 exemption of the FAA[,]" Plaintiffs have not met their burden.  See Lenz v. Yellow Transp., Inc., 431 F.3d 348, 351 (8th Cir. 2005).  The Lenz factors are:

> first, whether the employee works in the transportation industry; second, whether the employee is directly responsible for transporting the goods in interstate commerce; third, whether the employee handles goods that travel interstate; fourth, whether the employee supervises employees who are themselves transportation workers, such as truck drivers; fifth, whether, like seamen or railroad employees, the employee is within a class of employees for which special arbitration already existed when Congress enacted the FAA; sixth, whether the vehicle itself is vital to the commercial enterprise of the employer; seventh, whether a strike by the employee would disrupt interstate commerce; and eighth, the nexus that exists between the employee's job duties and the vehicle the employee uses in carrying out his duties (i.e., a truck driver whose only job is to deliver goods cannot perform his job without a truck).

Id. at 352.  In Mr. Herrmann's own words, he was an "administrator, sales agent, and company manager" who oversaw "the administrative paperwork associated with shipping and freight, work[ed] with customers on bills of lading, and

process[ed] customers shipments via common carriers, rail, and other means." (Herrmann Decl. ¶¶ 4-5.) He also "handled billing and other pricing issues" and "tracked packages through the system on behalf of customers[.]" (Id. ¶¶ 8-9.) As Unishippers characterizes its franchise business, it partnered "with licensed carriers . . . to handle the Unishippers customer shipments" and provided MSA with "access to Unishippers' network of licensed carriers and negotiated shipping rates, and [MSA] acted as the broker for customers seeking to ship goods through those carriers." (Doc. no. 32-1 ¶¶ 3-4.) Moreover, "MSA <u>only</u> had a transportation broker license, and was not a licensed motor carrier[.]" (Id. ¶ 7 (emphasis in original).)

Based on the limited evidence before the Court, it appears that (1) Mr. Herrmann was not directly responsible for transporting goods, as he only occasionally and incidentally handled goods that travel in interstate commerce;[10] (2) Mr. Herrmann did not have supervisory authority over the truck drivers, aside from his own statement that he "called drivers . . . to insure the efficient and timely delivery of packages" (Id. ¶ 8);[11] (3) Mr. Herrmann was not part of a class of employees for which special arbitration already existed; (4)

---

[10]    Unishippers maintains that "[a]s a Unishippers franchisee, neither MSA, nor any of its officers or employees . . . should have physically transported the goods themselves." (Doc. no. 32-1 ¶ 6.)

[11]    Unishippers also rejects this contention, "Unishippers' network of licensed carriers are separate companies, and were not in any way under the supervision of MSA or Mr. Herrmann." (Id. ¶ 8.)

a strike by Mr. Herrmann would not disrupt interstate commerce; and (5) Mr. Herrmann could perform his duties without a vehicle. Accordingly, the Court finds that Mr. Herrmann is not sufficiently engaged as a transportation worker to qualify under the FAA's narrow exemption.

Stated more succinctly, the Court is presented with no persuasive or controlling authority to support exemption on the one hand and "the strong and liberal federal policy favoring arbitral dispute resolution" on the other. See Swift, 288 F. Supp. 2d at 1035-36. On this record, "the Court cannot conclude . . . that § 1 bars the enforcement of the arbitration provision[s] at issue." Id. Accordingly, the Court concludes that the FAA applies to the Franchise Agreement as well as the Non-Competition Agreement.

## B.  Effect of the Delegation Provision on Plaintiffs' Remaining Arguments

Both the Franchise Agreement and Non-Competition Agreement contain what the Supreme Court has termed a "delegation provision." These provisions confer authority on the arbitrator to resolve disputes regarding the enforceability of agreements, including whether the agreement itself is void or voidable. Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 69 (2010). With these delegation provisions, "parties can agree to arbitrate 'gateway questions of arbitrability,' such as whether

the parties have agreed to arbitrate or whether their agreement covers a particular controversy." Id. at 68-69 (listing cases). Section 9(A)(v) of the Non-Competition Agreement provides that MSA and Mr. Hermann

> mutually intend and agree that (1) all issues relating to arbitrability and the enforcement of the agreement to arbitrate contained herein will be (i) decided by the arbitrator (including all claims that this Agreement in general, was procured by fraud in the inducement or otherwise) and (ii) governed exclusively by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and the federal common law of arbitration[.]

(Non-Competition Agreement § 9(A)(v)(emphasis in original).)

Similarly, the Franchise Agreement provides as follows:

> [T]he parties mutually intend and agree that (1) all issues relating to arbitration and/or the enforcement of the agreement to arbitrate contained herein will be (i) decided by the arbitrator (including all claims that this Agreement was procured by fraud in the inducement or otherwise) and (ii) governed exclusively by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and the federal common law of arbitration[.]

(Franchise Agreement § 9.01(f) (emphasis in original).) The Franchise Agreement additionally states "[t]he arbitrator (rather than the court) will decide any questions relating in any way to the parties' agreement (or claimed agreement) to arbitrate, including but not limited to applicability, subject matter, timeliness, scope, remedies and any alleged fraud in the inducement, or otherwise." (Id. § 9.01(b).)

In recognizing the validity of delegation provisions, the Supreme Court distinguishes two types of validity challenges under the FAA: challenges to the validity of the agreement to

arbitrate and challenges to the contract as a whole.   Rent-A-Center, 561 U.S. at 70.   The Supreme Court has held, however, that "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate.   As a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."   Id. at 70-71 (internal quotations and alteration omitted).

The three arguments made by Plaintiffs clearly fall into the latter category and, when coupled with the delegation provision, must be referred to the arbitrator.   Plaintiffs argue (1) the Franchise Agreement was no longer in place when the complained of conduct occurred and therefore there is no binding contract; (2) Plaintiffs' claims fall outside the scope of the Franchise Agreement's arbitration provision because they fall under an exception contained therein; and (3) the Non-Competition Agreement was either waived, and thus no longer exists, or is void as against public policy.

i.   *Validity Of The Franchise Agreement's Arbitration Provisions*

As to Plaintiffs' first argument, they represent that they justifiably relied on Unishippers' representation that the Franchise Agreement would be terminated on February 6, 2015, and that all of the conduct complained of occurred after that date.

(Pl. Resp. at 16.)   This argument fails for several reasons.   At the outset, the argument is plainly not supported by Plaintiffs' Complaint.   Of the fifteen paragraphs of "Factual Allegations," only two could arguably relate to events after February 6, 2015. Indeed, the bulk of the facts center on Plaintiffs' allegation that Unishippers made up revenue rules in 2014 so it could terminate the Franchise Agreement.   (See Compl. ¶¶ 14-17.) Moreover, if Plaintiffs' representations in brief are correct,[12] they have foreclosed at least one cause of action, if not more. In Plaintiffs' complaint they allege that "Defendant and its agents conspired to push Plaintiffs . . . out of the franchise and obtain [their] client lists."   (Id. ¶ 77.)   Plaintiffs additionally assert causes of action for the breach of the Franchise Agreement and Unishippers' allegedly fraudulent or negligent misrepresentation.[13]   If Plaintiffs do in fact state claims only for conduct occurring after February 6, 2015 when there was allegedly no agreement in place, they appear to be waiving their allegations regarding the termination of the

---

[12]   "All conduct Plaintiffs complain of relative to Defendant occurred after February 6, 2015 when the relationship of franchisor and franchisee no longer existed.   Defendant confuses the issue in its brief when it attempts to state that all conduct complained of in the Complaint related to the franchise agreements and Non-Competition Agreement.   It does not.   The conduct Plaintiffs complain of all occurred after February 6, 2015 when there were no longer binding contracts to enforce." (Pl. Resp. at 16.)

[13]   Plaintiffs' complaint is not entirely clear regarding the misrepresentation claim.   As best the Court can discern, Plaintiffs take issue with Unishippers' failure to "perform its obligations under the Agreement" (Compl. ¶ 41) and its failure to terminate the franchise agreements as contemplated in the December 5, 2014 letter (Pl. Resp. at 4-5). Either way, Plaintiffs' claims undoubtedly rely on occurrences before February 6, 2015.

Franchise Agreement and any misrepresentations that occurred as part of that process.

The perceived inconsistency between Plaintiffs' Complaint and brief notwithstanding, Plaintiffs' allegation that the Franchise Agreement was terminated — and therefore not subject to arbitration — is more akin to a challenge to the contract as a whole, which is for the arbitrator to consider in light of the delegation clause. As discussed above, arbitration provisions are "severable from the remainder of the contract." Rent-A-Center, 561 U.S. at 71. Therefore, for this Court to bypass arbitration and consider Plaintiffs' arguments, the challenge must be directed at the delegation provision itself. Plaintiffs argue that because there is no valid contract in place, there can be no requirement to arbitrate. They do not, for example, allege that the delegation provision is ambiguous or itself unconscionable. See Given v. M&T Bank Corp. et al., 674 F.3d 1252, 1256 (11th Cir. 2012).

Moreover, these parties, who are all sophisticated and experienced business professionals, evidenced a "clear and unmistakable" intent that questions of arbitrability be delegated to the arbitrator. Given, 674 F.3d at 1255 ("Courts should enforce valid delegation provisions as long as there is clear and unmistakable evidence that the parties manifested their intent to arbitrate a gateway question." (internal quotations omitted)). Having made no argument that the

25

delegation provision is invalid, rather than the contract as a whole, the Court finds Plaintiffs' argument in this respect unavailing.

### ii. *Scope Of The Arbitration Agreement*

Plaintiffs next argue that their claims fall outside the scope of the arbitration agreement. They base this argument on an exception contained within the Franchise Agreement for disputes relating to the intentional interruption of business operations. Whether this exception applies, however, is not for the Court to decide. Based on the delegation provision, which the Court reiterates has not been challenged independently, it is clear that the parties intended for an arbitrator to determine the arbitrability of "all issues." Less it be more clear, the parties went so far as to underline the term "all." "Because the delegation provision encompasses *any* issue, it encompasses [Plaintiffs'] claims for relief." Given, 674 F.3d at 1255-56 (interpreting a delegation provision stating "Any issue regarding whether a particular dispute or controversy is . . . subject to arbitration will be decided by the arbitrator." (alteration in original)); see also Anders v. Hometown Mortg. Servs., Inc., 346 F.3d 1024, 1028 (11th Cir. 2003) ("The agreement could not have been broader. Any disputes means all disputes, because 'any' means all." (some quotation marks omitted)). Indeed, the Franchise Agreement contemplates

the arbitrator deciding "any questions relating in any way to the parties' agreement (or claimed agreement) to arbitrate, including . . . scope . . . ." (Franchise Agreement § 9.01(b).)

### iii. *Validity And/Or Waiver Of The Non-Competition Agreement*

Plaintiffs finally argue that the Non-Competition Agreement was either waived or is void against public policy. As a preliminary matter, this case presents a host of issues which, by the terms of the two agreements, must be submitted to arbitration. The validity of the Non-Competition Agreement is but one piece of the puzzle. Had the Court been presented with this discrete issue alone, and not coupled with the Franchise Agreement, the Court would likely not reach the same result, as the Non-Competition Agreement is clearly void under applicable Georgia law. *See, e.g.*, *Bazemore v. Jefferson Capital Sys., LLC*, No. CV 314-115, 2015 WL 2220057, at *6 (S.D. Ga. May 11, 2015) (citing *Douglas v. Regions Bank*, 757 F.3d 460 (5th Cir. 2014) and *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed. Cir. 2006) for the proposition that "a gateway issue that is 'wholly groundless' should not be subject to arbitration").

However, and particularly in light of the totality of this action, the Court reiterates that the valid delegation provisions must be enforced. As above, Plaintiffs' position focuses on the validity and existence of the contract and not

the validity of the specific, severable arbitration provision. Indeed, Plaintiffs' waiver argument is virtually identical to their argument that the Franchise Agreement was no longer in effect at the time the complained of conduct occurred.

### III. Conclusion

For all of the reasons contained herein, the Court is obliged to adhere to the strong federal policy of the FAA encouraging the enforcement of arbitration provisions. As a matter of procedure, the FAA instructs district courts to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" 9 U.S.C. § 3. Accordingly, the Court finds that dismissal is not the appropriate course of action. Instead, the Court will stay this matter pending resolution of arbitration. As such, Unishippers' Motion to Dismiss to Compel Arbitration (Doc. no. 11) is **GRANTED IN PART**. The Court hereby **GRANTS** Unishippers' motion to the extent it seeks to compel arbitration and **STAYS** the action pending the completion of arbitration. Plaintiffs' Motion for Hearing (Doc. no. 19) is **DENIED**. Moreover, because the Court finds that the parties must proceed to arbitration, Chris Herrmann's Motion for Preliminary Injunction (Doc. no. 20) is **DENIED** at this time. See O.N. Equity Sales Co. v. Samuels, No. 8:07-cv-1091-T-23TGW, 2007 WL 4237013, at *4 (M.D. Fla. Nov. 30,

2007) ("The appropriate focus in this case is upon the standards for compelling arbitration rather than upon the standards for granting a preliminary injunction. Thus, if the requirements for arbitration are met, the request for a preliminary injunction against arbitration would correspondingly fail."), *adopted at* No. 8:07-cv-1091, 2008 WL 104079 (M.D. Fla. Jan. 8, 2008).

It is further **ORDERED** that this case is **CLOSED** for all purposes of statistical reporting. Either party may, by motion, seek to re-open this matter following arbitration if appropriate and necessary.

**ORDER ENTERED** at Augusta, Georgia, this 20th day of May, 2015.

_____
UNITED STATES DISTRICT JUDGE